PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

> *Plaintiff-Appellee,*

v.

EUGENE SHANER PENNIEGRAFT,

> *Defendant-Appellant.*

No. 09-4959

Appeal from the United States District Court
for the Middle District of North Carolina, at Greensboro.
Thomas D. Schroeder, District Judge.
(1:08-cr-00231-TDS-2)

Argued: December 10, 2010

Decided: June 2, 2011

Before AGEE and DAVIS, Circuit Judges, and David A.
FABER, Senior United States District Judge for the
Southern District of West Virginia, sitting by designation.

---

Affirmed by published opinion. Senior Judge Faber wrote the
opinion, in which Judge Agee and Judge Davis joined.

---

## COUNSEL

**ARGUED**: Stacey Dawn Rubain, QUANDER & RUBAIN,
Winston-Salem, North Carolina, for Appellant. Lisa Blue
Boggs, OFFICE OF THE UNITED STATES ATTORNEY,

Greensboro, North Carolina, for Appellee. **ON BRIEF:** Anna Mills Wagoner, United States Attorney, Greensboro, North Carolina, for Appellee.

---

## OPINION

FABER, Senior District Judge:

Appellant Eugene Shaner Penniegraft was convicted of possession with intent to distribute cocaine base and aiding and abetting, in violation of 18 U.S.C. §§ 841(a) and 2; possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and being a felon in possession of firearms, in violation of 18 U.S.C. § 922(g)(1). He appeals his convictions on three grounds.[1] First, he contends there was insufficient evidence to support his convictions. Penniegraft also contends that the district court erred in admitting certain Rule 404(b) evidence. Finally, he argues that the court erred in continuing to poll the jury after one juror indicated that the verdict was not unanimous. Finding Penniegraft's claims to be without merit, we affirm.

I.

Viewed in the light most favorable to the government, the evidence at trial established the following. In December 2007, based on information received from a confidential informant, officers of the Greensboro Police Department began conducting surveillance of a residence located at 916 Willow Road in Greensboro, North Carolina. During surveillance of that address, law enforcement observed foot and vehicle traffic that was consistent with drug trafficking. In addition, authori-

---

[1]Penniegraft has also filed a motion to file a pro se supplemental brief. Because Penniegraft is represented by counsel and this appeal is not submitted pursuant to *Anders v. California*, 386 U.S. 738 (1967), that motion is denied.

ties arrested several people leaving the residence with crack cocaine during that timeframe.

Thereafter, on December 29, 2007, authorities obtained and executed a search warrant for the residence at 916 Willow Road. At the time of the search, Penniegraft, Juwana Bates, Jeffrey Hampton, and Vermont Carmack were present at the residence. Upon seeing authorities approaching, Hampton fled into the bathroom carrying a firearm that he placed in the sink.

During a search of the den/living room area, law enforcement found several caches of plastic baggies, marijuana, a bag containing crack cocaine, a box of ammunition, a digital scale with white residue, two crack pipes in the living room, and a black airsoft pistol. They also discovered a black, unlocked box containing crack cocaine, currency, and marijuana under the couch in that room. Digital scales with white residue and a bag of ammunition were recovered from the laundry room. Also discovered in a bedroom closet were a bag of cocaine, digital scales, and a loaded rifle. In that same bedroom, officers discovered a loaded 9mm handgun behind a dresser, empty baggies, a bag of marijuana in the nightstand, two pieces of glass with white residue, digital scales, and $135.00. Finally, officers recovered the .357 Smith & Wesson handgun that Hampton had placed in the bathroom sink.

The occupants of the house were arrested and, upon searching Penniegraft, authorities discovered $1200 and a key to the house on his person.

## II.

On June 30, 2008, a federal grand jury in the Middle District of North Carolina returned a six-count indictment charging Penniegraft, Bates, and Hampton with various drugs and weapons offenses. Penniegraft was named in Counts Two, Three, and Five of the indictment, charging him with (1) pos-

session with intent to distribute cocaine base ("crack") and aiding and abetting, in violation of 18 U.S.C. §§ 841(a) and 2; (2) possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c); and (3) being a felon in possession of firearms, in violation of 18 U.S.C. § 922(g)(1).

Prior to trial, Penniegraft moved to exclude evidence of a prior arrest that the government intended to introduce pursuant to Federal Rule of Evidence 404(b). Over Penniegraft's objection, the court found the evidence admissible. At trial, Officer Mark Ingram testified that, on August 11, 2007, defendant was arrested in possession of 3.2 grams (gross weight) of a substance containing cocaine base or "crack". At that time, Penniegraft told Ingram that he lived at 916 Willow Road, the residence he shared with Bates.

At the close of the evidence, defendant unsuccessfully moved for a judgment of acquittal. The jury then returned a verdict of guilty on all counts. At defendant's request, the court polled the jury. During the polling, the clerk had the following exchange with one of the jurors:

> **CLERK**: Juror Number 5, Miss Underwood, does the verdict as published constitute your individual verdict in all respects?

> **JUROR NO. 5**: Can you describe that one better for me, put it in a different way?

> **CLERK**: Is the verdict as read your true verdict?

> **COURT**: Do you agree unanimously with all of the - - with all of the answers to the questions in the verdict, that is, the guilty finding on all counts?

> **JUROR NO. 5**: I'm still kind of iffy.

>     **COURT**: All right, ma'am. If you would, Ms. Solo-
>     mon, complete polling the jury.

JA 629-30. Without objection from either party, the clerk completed the polling and the remaining jurors indicated their assent to the verdict.

The court then held a bench conference whereupon Penniegraft objected to allowing the jury to continue deliberations and requested a mistrial. The court took a brief recess to give the attorneys an opportunity to research the issue and make suggestions about how to proceed. After the recess, Penniegraft argued that the court should (1) declare a mistrial; (2) inquire whether Juror No. 5 would feel comfortable deliberating further; or (3) give the jury a modified *Allen* charge. The court denied the request for a mistrial but questioned whether the court's continued polling of the jury after one juror expressed hesitation about the verdict in open court was coercive. The court also denied defendant's request to question Juror No. 5 further, finding that it would be coercive to do so. The court then gave a modified *Allen* charge, to which defendant consented, instructing the jury to further deliberate.

The jury again returned a verdict of guilty on all counts. After the court denied defendant's motion for a judgment notwithstanding the verdict based on sufficiency of the evidence, the court reiterated its concern regarding the propriety of the continued polling of the jury after Juror No. 5 had expressed reservations. After another hearing, the court concluded that it was without jurisdiction to entertain a motion for a new trial on the polling issue but that the issue was preserved for appeal.

Penniegraft was sentenced to 327 months on Count Two, 60 months on Count Five to run consecutive to Count Two, and 120 months of imprisonment on Count Three to run concurrent to Count Two, for a total of 387 months of imprisonment. Defendant filed a timely notice of appeal.

### III.   Sufficiency of the Evidence

Penniegraft argues that there was insufficient evidence to support the guilty verdicts on all counts of conviction. Specifically, Penniegraft argues that the evidence failed to establish he possessed either the drugs or firearms as charged in the indictment. Furthermore, according to Penniegraft, even if the government could meet its burden of showing he was in possession of the firearms, the evidence did not show that his possession was in furtherance of a drug trafficking offense.

### A.

This court reviews the denial of a Rule 29 motion de novo. *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005), *cert. denied*, 547 U.S. 1113 (2006). In reviewing the sufficiency of the evidence following a conviction, the court is to construe the evidence in the light most favorable to the government, assuming its credibility, and drawing all favorable inferences from it, and will sustain the jury's verdict if *any* rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir.), *cert. denied*, 513 U.S. 1135 (2002). "If there is substantial evidence to support the verdict, after viewing all of the evidence and the inferences therefrom in the light most favorable to the Government," the court must affirm. *United States v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994), *cert. denied*, 513 U.S. 1135 (1995). Furthermore, this court "cannot make [its] own credibility determinations but must assume that the jury resolved all contradictions in testimony in favor of the Government." *United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1402 (4th Cir. 1993).

B.

1.

In order to establish the offense proscribed by 21 U.S.C. § 841(a)(1), possession with intent to distribute cocaine base, the Government had to prove beyond a reasonable doubt that Penniegraft possessed cocaine base, that he did so knowingly, and with an intent to distribute. *United States v. Burgos*, 94 F.3d 849, 873 (4th Cir. 1996) (en banc).

The law recognizes two kinds of possession: actual possession and constructive possession. *See id.* "'Actual possession' is defined as '[p]hysical . . . control over property.'" *United States v. Scott*, 424 F.3d 431, 435 (4th Cir. 2005) (quoting Black's Law Dictionary 1201 (8th ed. 2004)). The government may prove constructive possession by demonstrating that a defendant exercised, or had the power to exercise dominion and control over an item. *Id.*; *see also Burgos*, 94 F.3d at 873. "A person has constructive possession over contraband when he has ownership, dominion, or control over the contraband itself or over the premises or vehicle in which it was concealed." *United States v. Armstrong*, 187 F.3d 392, 396 (4th Cir. 1999).

"In addition, [p]ossession need not be exclusive, but may be shared with others, and is susceptible of proof by circumstantial as well as direct evidence." *United States v. Laughman*, 618 F.2d 1067, 1077 (4th Cir.), *cert. denied*, 447 U.S. 925 (1980) (internal citations and quotations omitted).

In arguing that there was insufficient evidence to show he possessed the 13.6 grams of crack cocaine discovered in the black box, Penniegraft relies upon Bates' statements that he had run out of drugs to sell that day, as well as her testimony that he sold his drugs and she sold hers.

At trial, codefendant Juwana Bates testified that Penniegraft did not have legitimate employment from 2002 until the

time of his arrest. Bates also testified that she and Penniegraft rented the residence at 916 Willow Road to sell drugs. According to Bates, both she and Penniegraft sold crack cocaine and marijuana and, on occasion, powder cocaine.

Bates also testified that, in general, Penniegraft would sell his drugs and she would sell hers. She further testified that both she and defendant regularly stored drugs in the black box located under the couch and that defendant also stored the .357 revolver in that box when it was not on his person. According to Bates, sometimes she and defendant would purchase drugs together because it was cheaper to purchase the drugs in larger quantities and break them up for resale. Finally, Bates testified that Penniegraft had run out of drugs to sell the morning of the search and did not have any left at the time of the search.

Jeffrey Hampton testified that he would visit the residence regularly to buy drugs from Penniegraft and had been purchasing drugs from him for one to two years, often in exchange for doing chores for him. Hampton stated that on the day of the search, he was at the residence with Bates, Carmack, and defendant and that defendant had promised to sell him crack in exchange for cleaning the dog cage.

In this case, the government presented substantial evidence that defendant had the power to exercise dominion and control over the crack cocaine. This is not a case where Penniegraft's guilt rested solely on his proximity to drugs in a residence. Bates testified that she and defendant rented the house together for the purpose of selling drugs. She also testified that the two would sometimes purchase drugs together. Furthermore, she testified that both she and defendant would often keep their drugs in the black box along with defendant's firearm. Also recovered during the search were drug paraphernalia, currency, and several firearms – all "tools of the trade" for a drug dealer. Furthermore, the jury was instructed that Penniegraft could be found guilty for aiding and abetting

another person's possession with intent to distribute cocaine base.

Based on the foregoing, we find there was substantial evidence to support Penniegraft's conviction on Count Two.

2.

As to the firearms, there was ample evidence that they belonged to defendant. Both Bates and Joanne Bryant, Penniegraft's girlfriend, testified that they had seen Penniegraft with firearms like those charged in the indictment. Bates testified that she did not own firearms but defendant did. According to Hampton, he saw Penniegraft with guns on "numerous" occasions. JA 253-54. Hampton went with Penniegraft to his mother's house so that he could change clothes and defendant gave Hampton the .357 handgun to transport back to the residence. When Hampton returned to the residence at 916 Willow Road, he placed the gun on the table and retrieved it when the police arrived and put it in the bathroom sink.

Moreover, because "a jury's finding of guilty may be supported by consciousness of guilt," *United States v. Obi*, 239 F.3d 662, 665 (4th Cir. 2001), the fact that defendant attempted to have Hampton claim ownership of the guns was evidence of his guilt. After his arrest, Penniegraft asked Hampton to take responsibility for the guns in the home and, in exchange, Penniegraft would "take care of" Hampton. JA 243-44. In addition, defendant contacted Bryant from jail and asked her to convince Hampton to write a statement taking responsibility for the firearms. In response, Bryant wrote several letters to Hampton in jail requesting that he write a statement saying the firearms were his and assuring him that he would be taken care of. Bryant signed the letters in the name of Penniegraft's mother and enclosed money in some of the envelopes.

As well, at defendant's request, Bates drafted a notarized statement falsely attributing ownership of the firearms to

Hampton. Both Bates and Bryant, however, testified that the firearms in the residence belonged to defendant and that they had seen him with firearms on many prior occasions. Bates also testified that, other than the day of the search, she had never seen Hampton with a gun and, to her knowledge, Hampton did not own any firearms.

3.

We also reject Penniegraft's claim that the evidence was insufficient to show the firearms were possessed in furtherance of a drug trafficking crime. Factors a jury can consider in determining whether firearms are possessed in furtherance of drug trafficking include: "the type of drug activity that is being conducted, accessibility of the firearm, the type of weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found." *United States v. Perry*, 560 F.3d 246, 254 (4th Cir.), *cert. denied*, 130 S. Ct. 177 (2009) (quoting *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002)).

The evidence at trial established that Penniegraft both sold drugs and possessed firearms. During execution of the search warrant, loaded firearms and ammunition were found in different parts of the house at 916 Willow Road, a location obtained for the purpose of selling drugs. Penniegraft had a key to the residence. Drugs and drug paraphernalia were also found at various locations in the house. When he was arrested, Penniegraft was in possession of $1200.00. Furthermore, Bates testified that Penniegraft often stored a firearm in the same black box where the two of them would store drugs. According to Jeffrey Hampton, "[w]henever [Penniegraft] had a gun in his hand, he had dope in his pocket." JA 254. Based on the foregoing, there was ample evidence to support the jury's guilty verdict on Count Three.

## IV.   Admission of Rule 404(b) Evidence

Penniegraft contends that the court erred in admitting evidence of the August 11, 2007, arrest because it was not similar to the offenses charged in this case. Specifically, he contends that (1) he possessed a much smaller quantity of drugs during the first arrest; (2) the first arrest did not occur at 916 Willow Road; and (3) the first arrest took place four months prior to the second arrest.

### A.

A district court's determination of the admissibility of evidence under Fed. R. Evid. 404(b) is reviewed for an abuse of discretion. *United States v. Queen*, 132 F.3d 991, 995 (4th Cir. 1997). An abuse of discretion occurs only when "the [district] court acted arbitrarily or irrationally in admitting evidence." *United States v. Williams*, 445 F.3d 724, 732 (4th Cir. 2006) (internal quotation marks and citation omitted).

Rule 404(b) prohibits the admission of "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). However, such evidence is "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* Rule 404(b) is an inclusionary rule, allowing evidence of other crimes or acts to be admitted, except that which tends to prove only criminal disposition. *See United States v. Sanchez*, 118 F.3d 192, 195 (4th Cir. 1997).

For such evidence to be admissible, it must be "(1) relevant to an issue other than the general character of the defendant; (2) necessary to prove an element of the charged offense; and (3) reliable." *United States v. Hodge*, 354 F.3d 305, 312 (4th Cir. 2004) (citing *Queen*, 132 F.3d at 997). Additionally, the probative value of the evidence must not be substantially outweighed by its prejudicial effect. *Id.*

B.

There was no error in admitting the evidence. The evidence was relevant to prove Penniegraft's knowledge and lack of mistake and necessary to prove the element of intent. "A not-guilty plea puts one's intent at issue and thereby makes relevant evidence of similar prior crimes when that evidence proves criminal intent." *Sanchez*, 118 F.3d at 196 (concluding that evidence was admissible to prove defendant's criminal intent). Here, defendant was arrested with crack cocaine only a few months prior to the search. His prior possession of crack cocaine, therefore, demonstrated his knowledge of the presence of crack cocaine in the residence at 916 Willow Road. As well, the fact that he identified 916 Willow Road as his address to the arresting officer back in August undermines his attempt to disassociate himself with that residence in the current case. Furthermore, the 404(b) evidence was reliable as the arresting officer testified at trial. For all these reasons, Penniegraft's argument is without merit.

V.     Jury Polling Issue

Penniegraft argues that the district court's continued polling of the jury after it became clear that the verdict was not unanimous was reversible error.

A.

As defendant did not object to the court's continued polling of the jury, this issue is reviewed for plain error. *United States v. Farrior*, 535 F.3d 210, 222 (4th Cir. 2008) (citing *United States v. Olano*, 507 U.S. 725, 733-36 (1993)). Under the plain error standard of review, to establish the authority to notice an error not preserved by a timely objection, a defendant must demonstrate (1) that an error occurred, (2) that the error was plain, and (3) that it affected his substantial rights. *See United States v. Promise*, 255 F.3d 150, 154 (4th Cir. 2001) (en banc). If the defendant satisfies these threshold

requirements, correction of the error is within the appellate court's discretion, which is "appropriately exercised only when failure to do so would result in a miscarriage of justice, such as when the defendant is actually innocent or the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* at 161 (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993) (internal quotation marks omitted)).

B.

Unquestionably, it is plain error for a trial judge to inquire as to the numerical division of a jury. The United States Supreme Court so held in *Brasfield v. United States*, 272 U.S. 448, 450 (1926). In that case, the defendants were convicted of conspiracy to possess and transport intoxicating liquors in violation of the National Prohibition Act. After some hours of deliberation the jury had not agreed on a verdict. The judge called in the jury and inquired as to their division. The jury foreman informed the court that the jury stood nine to three without indicating whether the majority favored conviction or acquittal. The Court, in an opinion by Justice Stone, held the practice to be per se reversible error, declaring:

> We deem it essential to the fair and impartial conduct of the trial that the inquiry itself should be regarded as ground for reversal. Such procedure serves no useful purpose that cannot be attained by questions not requiring the jury to reveal the nature or extent of its division. Its effect upon a divided jury will often depend upon circumstances which cannot properly be known to the trial judge or to the appellate courts and may vary widely in different situations, but in general its tendency is coercive. It can rarely be resorted to without bringing to bear in some degree, serious, although not measurable, an improper influence upon the jury, from whose deliberation every consideration other than that of the evi-

dence and the law as expounded in a proper charge, should be excluded. Such a practice, which is never useful and is generally harmful, is not to be sanctioned.

*Brasfield*, 272 U.S. at 450.

But *Brasfield*, however strong the language of the Court and inflexible the rule established, does not answer the present inquiry. In *Brasfield*, there was clearly no verdict and the trial judge asked about the division *sua sponte*. Here, the situation is quite different – the trial judge, upon being informed that there was a verdict, proceeded to poll the jury at the request of the defendant. Jury polls are governed by Rule 31(d) of the Federal Rules of Criminal Procedure which is designed to insure that the verdict is indeed unanimous and to uncover coercion, if any exists. *United States v. Edwards*, 469 F.2d 1362, 1366-67 (5th Cir. 1972). The rule reads as follows:

> After a verdict is returned but before the jury is discharged, the court must on a party's request, or may on its own, poll the jurors individually. If the poll reveals a lack of unanimity, the court may direct the jury to deliberate further or may declare a mistrial and discharge the jury.

Fed. R. Crim. P. 31(d).

Accordingly, when Penniegraft asked for a poll the trial court was under a mandate to comply – it had no choice in the matter. Defendant contends that, when the court continued the poll after Juror No. 5 said she was "still kind of iffy" about the defendant's guilt, it brought the case within the inflexible rule of *Brasfield*, with the result that reversal is required. We disagree.

The United States Court of Appeals for the Sixth Circuit was confronted with this issue in *Lyell v. Renico*, 470 F.3d

1177 (6th Cir. 2006). There, the defendant was convicted in state court of assault with intent to commit murder and brought a claim for habeas corpus relief in federal court. In that case, the judge, having been informed that there was a unanimous guilty verdict, polled the jury at defendant's request. During the poll, the first eleven of fourteen jurors concurred in the guilty verdict, but Juror No. 12 responded, "No. I am sorry, Judge." *Id.* at 1181. The court continued the poll and both of the remaining jurors concurred in the guilty verdict. The defendant did not object to the continued polling, but moved for a mistrial after the court gave the jury a truncated *Allen* charge and sent them out to continue deliberations. An hour later, the jury came back with a unanimous verdict; Juror No. 12 had joined the majority.

The Court of Appeals for the Sixth Circuit concluded that the trial court did not commit reversible error in continuing to poll the jury after learning the verdict was not unanimous. Acknowledging *Brasfield*, the court explained why that decision did not control the inquiry in the case before it:

> *Brasfield* and all of the other cases upon which Lyell relies stem from judicial inquiries into the numerical division of a deadlocked jury. Yet there is a world of difference between juror-coercion claims arising from deadlocked juries and those arising from post-verdict juror polling. In the former situation, there is never any reason to expose the numerical division of the jurors. The trial court may decide to give a seemingly deadlocked jury an *Allen* charge to urge it to continue its deliberations in good faith, but the court has no reason to ask, or find out, which jurors stand where on the charges.
>
> The same is not true with juror polling. There, it is not only necessary but desired (at least from the defendant's perspective) for the public to learn that

at least one juror has opted to take a stand against conviction.

*Id.* at 1183. The *Lyell* court continued:

> [T]here seemed to be little point to continuing to poll the last two jurors (save with defense counsel's consent) because one holdout suffices to send the jury back to deliberate. But there is nothing about the judge's actions that suggests that this was anything more than a slip in inertia after polling the first 12 jurors. Nor, it bears adding, did defense counsel do anything to stop the judge, which itself suggests a non-coercive environment.

*Id.*

The decision on this point in *Lyell* is weakened somewhat by the fact that defendant's conviction was overturned on other grounds and because one of the three appellate judges filed a concurring opinion that vigorously disagreed with the majority on the polling issue. The concurring judge argued that there is nothing in *Brasfield* that narrows its holding to deadlocked jury cases where the court inquires, on its own motion, how the jury stands numerically. According to the concurrence, *Brasfield* extends to any disclosure of numerical division "regardless of whether a jury is deadlocked, at an impasse, or in a different stage of jury deliberations." *Id.* at 1190 (Clay, J., concurring).

Other circuits, however, have reached the same conclusion on the polling issue as the majority in *Lyell*, and the weight of authority is of the opinion that *Brasfield* does not apply where the judge continues to poll the jury after learning there is not a unanimous verdict. In *United States v. Gambino*, 951 F.2d 498 (2d Cir. 1991), numerous defendants were tried on various narcotics offenses. After five days of deliberation, the foreperson of the jury sent a note to the court informing it that

the jury had reached a verdict. Counsel for two of the defendants requested a poll. Both Juror No. 2 and Juror No. 7 indicated that they did not agree with the guilty verdict. On each occasion, counsel moved for a mistrial but did not object to continued polling of the jury. The court denied the motions for mistrial and indicated it would instruct the jury to resume deliberations, but insisted nevertheless on completing the poll. The jury deliberated two more hours and returned unanimous verdicts of guilty.

The Second Circuit affirmed the convictions holding that continued polling violates a defendant's rights only when it is coercive. According to the *Gambino* court:

> [W]hen the trial judge continues to poll the jury after one juror disagrees with the verdict, reversible error occurs only when it is apparent that the judge coerced the jurors into prematurely rendering a decision, and not merely because the judge continued to poll the jury.

> * * *

> Whether the method employed in conducting a jury poll is coercive must be evaluated on the facts and circumstances of the particular case and not simply because the trial judge continued to poll the jury after a juror dissented from the reported verdict.

*Id.* at 501-02.

Three other circuit courts of appeal have joined the courts in *Lyell* and *Gambino*. In *United States v. Fiorilla*, 850 F.2d 172 (3d Cir. 1988), the court continued to poll the jury after Juror No. 10 indicated he disagreed with the verdict of guilty as to defendant John Fiorilla.[2] Instructed to resume delibera-

---

[2]The jury also returned guilty verdicts as to three of the other four defendants: Mary Fiorilla, Thomas Fiorilla, and Frances Scullion. Defen-

tions, the jury reached a unanimous verdict of guilty as to defendant John Fiorilla after two additional days.[3] The Third Circuit reviewed the facts and circumstances of the case and found continued polling to be non-coercive. The court summarized the rationale for its conclusion as follows:

> Here, the trial court carefully considered and rejected appellants' request for a new trial. In so ruling, the court referred to a number of factors surrounding the continuation of the jury poll after Mr. Fonseca's dissent. They include counsels' failure to voice a specific and contemporaneous objection to the polling, which demonstrates to some degree the absence of a coercive atmosphere. Upon learning of the dissidence, the trial judge dismissed the jurors for the day. This removed Mr. Fonseca from the immediate "attacks" of his peers. Before deliberations resumed the next day, the trial judge delivered a cautionary instruction asking the jurors to carefully weigh and consider the views of their fellow jurors. Most important was the trial court's reliance on the deliberations having continued for an additional two days before the jury returned unanimous guilty verdicts against the appellants. The district court concluded that this lapse of time before the return of guilty verdicts demonstrated that the lone dissenting juror was not coerced by the poll to capitulate to the views of the majority. *Cf. Brooks*, 420 F.2d at 1353-54 (jury's returning verdict after twenty minutes of deliberations after poll upheld). Although Mr. Fonseca initially stood as the lone vote for acquittal on

dant Charles Hirschkind was found not guilty on all counts. Upon further questioning, Juror No. 10 stated that he also disagreed with the guilty verdicts against Thomas Fiorilla and Scullion.

[3]The jury, however, changed its earlier guilty verdict as to Thomas Fiorilla and Frances Scullion, completely exonerating them.

Thomas Fiorilla's and Frances Scullion's verdicts, the jury ultimately acquitted them. His view on these two defendants in the end carried the day. Thus, it was plain to the district judge, as it is to us, that Mr. Fonseca was not afraid to stand up for his convictions and that his peers took his opinions seriously during their two days of further deliberations.

*Id.* at 176-77.

In *United States v. Amos*, 496 F.2d 1269 (8th Cir. 1974), the jury announced it had reached a verdict of guilty as to all counts in a fourteen-count indictment for tax fraud. A poll of the jury, however, revealed that Juror No. 8 had consented to the verdict of guilty only as to count four. The judge continued the poll as to count four only, said it would receive the guilty verdict on count four, and indicated it would send the jury back for further deliberations on the remaining counts. At this point, counsel for defendant Amos asked the judge to repoll the jury on count four only and the court did so. After the repoll and hearing Juror No. 8's response, the judge changed his mind about accepting a partial verdict and instructed the jury to resume deliberations on all counts. After twenty-five minutes the jury found Amos guilty on all fourteen counts. The court repolled the jury again and made further inquiry of Juror No. 8 to make sure he agreed with the guilty verdict on all counts.

The United States Court of Appeals for the Eighth Circuit indicated that whether the judge's actions were erroneous depends on "whether it is likely that the proceedings conducted by the trial court coerced the juror in arriving at his final verdict." *Id.* at 1272. The court noted further that "since the trial judge is present on the scene, we must pay due deference to his views on whether the recalcitrant juror's ultimate acquiescence in the verdict came freely, without pressure from the court." *Id.* at 1273. The court found no error in the trial court's actions, noting that it gave an objective and bal-

anced instruction to the jury to resume deliberations, that it made specific inquiry of the reluctant juror after the second verdict was returned, and that defendant did not object to the court's action or move for a mistrial.

In *United States v. Brooks*, 420 F.2d 1350 (D.C. Cir. 1969), the defendant requested that the court continue the poll after one juror disagreed with the verdict of guilty on a certain count. Further polling revealed that a second juror also had reservations regarding the same count. The appellate court found no error in the judge's action indicating that "the trial judge is in a much better position than an appellate tribunal to determine whether a recalcitrant juror's eventual acquiescence in a verdict was in fact freely given." *Id.* at 1353.

Acknowledging that a majority of the federal appellate courts to have considered the issue have rejected his argument that it is plain error to continue to poll a jury after one juror indicates there is a lack of unanimity, Penniegraft directs the court's attention to *United States v. Spitz*, 696 F. 2d 916 (11th Cir. 1983). In *Spitz*, after one juror dissented from the verdict, the judge continued to poll the jury. Upon completing the poll, the judge directed the dissenting juror to stand and ordered her once again to repeat in open court that she disagreed with the verdict. While the juror was still standing, the judge proceeded to give an *Allen* charge and then excused the jury to return to its deliberation. The jury returned a half hour later with a unanimous guilty verdict.

The United States Court of Appeals for the Eleventh Circuit found that the trial court's failure to stop polling as soon as the lack of unanimity was revealed was reversible error. We reject the rigid rule of *Spitz*[4] and conclude that each case

---

[4]*Spitz* is also distinguishable on its facts. Absent from the instant case is the type of coercive conduct present in that case, i.e., making the dissenting juror stand and repeat her objection to the verdict and giving an *Allen* charge while she remained standing.

involving continued polling of a jury after one juror dissents must be viewed on its own merits (or demerits), considering all the facts and circumstances and giving due deference to the trial judge. Here we find no error. There was no objection to continued polling of the entire jury.[5] The court denied defendant's request to question the recalcitrant juror further, fearing that singling the juror out would be coercive. In fact, a review of the record makes clear the district court in this case took great pains to avoid doing anything that the jury would perceive as coercive. Furthermore, the court gave a fair and perfectly balanced *Allen* charge when it instructed the jury to deliberate further.

In conclusion, we join the majority of circuits to have considered the issue and hold that in conducting a poll of the jury at defendant's request, pursuant to Fed. R. Crim. P. 31(d), when the trial judge continues the poll after a lack of unanimity is revealed, absent an objection by the defendant, "reversible error occurs only when it is apparent that the judge coerced the jurors into prematurely rendering a decision, and not merely because the judge continued to poll the jury." *Gambino*, 951 F.2d at 501. Accordingly, we find the district court's continued polling of the jury in this case was not reversible error.

## VI.

For the foregoing reasons, we affirm Penniegraft's convictions.

*AFFIRMED*

---

[5]We also conclude that some deference to trial counsel is warranted. In some circumstances, it might be beneficial to the defendant to continue polling if such polling shows additional jurors who are uncomfortable with the verdict.