**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 12-4323**

———————————

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

    v.

MICHAEL ANGELO ECKLIN,

              Defendant - Appellant.

———————————

**No. 12-4324**

———————————

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

    v.

KHALLID MUHUMMED CARTER, a/k/a Khallid Muhamad Carter,

              Defendant - Appellant.

———————————

Appeals from the United States District Court for the Eastern District of Virginia, at Norfolk.  Robert G. Doumar, Senior District Judge.  (2:11-cr-00139-RGD-DEM-1; 2:11-cr-00139-RGD-DEM-2)

———————————

Argued:  March 20, 2013           Decided:  June 14, 2013

———————————

Before TRAXLER, Chief Judge, WYNN, Circuit Judge, and HAMILTON, Senior Circuit Judge.

---

Affirmed by unpublished opinion. Judge Wynn wrote the opinion, in which Chief Judge Traxler and Senior Judge Hamilton concurred.

---

**ARGUED:** Kim Michelle Crump, Norfolk, Virginia; Paul Granville Watson, PAUL G. WATSON IV, PC, Eastville, Virginia, for Appellants. Benjamin L. Hatch, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee. **ON BRIEF:** Neil H. MacBride, United States Attorney, Alexandria, Virginia, Cameron M. Rountree, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

After a joint jury trial, Defendants Michael Ecklin and Khallid Carter each were convicted of possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). At trial, neither defendant disputed that Ecklin fired an AK-47, that Carter gave him the loaded weapon, or that both defendants were convicted felons. Instead, each defendant contended that his gun possession was justified in response to an armed third person.

On appeal, Defendants argue that the district court erred by improperly interfering with their trial and by imposing obstruction of justice sentencing enhancements. Further, Ecklin separately contends that the government knowingly offered false testimony and that the district court erred by admitting certain evidence. Carter separately argues that the government's remarks during closing argument prejudiced him and that there was insufficient evidence to support his conviction. For the reasons addressed below, we disagree and affirm Defendants' convictions.

I.

On March 13, 2011, Ecklin had an altercation with Tiara Faulcon. Faulcon reported the fight to her mother, Shannel Bonds, who responded by confronting Ecklin in the parking lot of

London Oaks apartment complex in Portsmouth, Virginia. Faulcon and her cousin, Drean Wallace, accompanied Bonds.

At some point during the dispute, Carter gave Ecklin a loaded AK-47. The incident eventually escalated into a shoot-out between Wallace and Ecklin. The shooting resulted in extensive property damage, but no one was physically injured. Subsequently, Ecklin and Carter each were charged with possession of a firearm by a convicted felon and with aiding and abetting each other's possession of a firearm.

The cases were jointly tried before a jury in December 2011 in the United States District Court for the Eastern District of Virginia. At trial, Defendants did not dispute that Ecklin fired an AK-47 while at London Oaks. Nor did they dispute that Carter handed Ecklin the loaded weapon. Rather, each defendant relied on a justification defense-that Ecklin and Carter possessed the gun only in response to Wallace's threatening Ecklin with a gun.

At trial, the government presented testimony from three eyewitnesses: Bonds, Faulcon, and Wallace. Bonds and Wallace testified that Ecklin had a gun before Wallace and that Ecklin began shooting before Wallace got his gun out of his car. Bonds and Wallace also testified that they saw Carter give the gun to Ecklin. Faulcon testified that she did not see Wallace with a

4

gun. Faulcon did, however, see Ecklin with a gun, and she ran when Ecklin began shooting.

The government also presented testimony from Dyron James, a federal prisoner. James stated that while in jail with Ecklin, he told Ecklin about the "necessity law" that allows a convicted felon to possess a firearm when his life is in danger or when another person is in danger. J.A. 481.

Defendants countered with eyewitness testimony. Tymetria Smith and Katina Tucker each testified that they ran after seeing Wallace with a gun, but neither saw Ecklin with a gun. Eric Jones stated that he saw Wallace pull out a gun and point it at Ecklin and that Ecklin was not holding a weapon at that time. Aquelah Moore testified that she saw Wallace and another individual-Dequan-struggling over a gun, but that she did not see Ecklin with a weapon.

Additionally, both Ecklin and Carter testified at trial. Ecklin stated that after Wallace pointed a gun at his face and threatened to kill him, Dequan, a friend of Ecklin's, tussled with Wallace while Ecklin backed up. Carter then handed Ecklin a gun, and Ecklin started shooting it in the air. Ecklin explained that once Wallace began shooting back, Ecklin "fired a lot of rounds real fast" in Wallace's direction. J.A. 448. Carter similarly testified that when he saw Wallace tussling with Dequan and pointing a gun at Ecklin, he picked up a gun

5

that was lying on the ground under a stairwell and gave it to Ecklin.

At the close of the government's case and also at the close of all the evidence, Defendants' counsel made Rule 29 motions for judgment of acquittal based, in part, on sufficiency of the evidence. The district court denied these motions with respect to the gun possession charges.

The jury found Ecklin and Carter guilty of possession of a firearm by a convicted felon.[1] Consistent with each defendant's Presentence Investigation Report, the district court imposed a two-level obstruction of justice sentencing enhancement for giving false testimony. Specifically, as to Ecklin, the district court increased Ecklin's offense level from 26 to 28 based upon its finding that Ecklin's testimony that he fired in self-defense conflicted with the jury's guilty verdict. The district court, however, announced that it would have given Ecklin the same sentence even without the obstruction of justice enhancement. As to Carter, the district court increased Carter's offense level from 22 to 24 based upon its finding that Carter falsely testified that he found the gun lying on the

---

[1] The jury also found Ecklin guilty of aiding and abetting Carter's weapon possession, but the district court subsequently granted Ecklin's motion for acquittal on that charge. And before the jury retired, the district court dismissed the aiding and abetting charge against Carter.

6

ground.  The district court sentenced both Ecklin and Carter to 120 months' imprisonment.

## II.

On appeal, Ecklin and Carter contend that the district judge deprived them of a fair trial by improperly interfering in their trial and that the district court's findings of fact did not support an obstruction of justice sentencing enhancement. Ecklin separately contends that the government knowingly offered false testimony and that the district court erred by admitting certain evidence.  Carter separately argues that the government's remarks during closing argument prejudiced him and that there was insufficient evidence to support his conviction. We address each issue in turn.

## A.

With their primary argument on appeal, Ecklin and Carter both contend that the district judge's repeated interruptions and extensive involvement in the questioning and impeachment of witnesses deprived them of a fair trial.  When a defendant raises a timely objection to judicial interference, we review for harmless error.  United States v. Godwin, 272 F.3d 659, 673 (4th Cir. 2001).  But when a defendant fails to object at trial, we review only for plain error.  Id.  Under plain error review,

a defendant must show that "the error affects substantial rights, actually changing the outcome of the trial proceedings." Id. at 672 (citation omitted).

Both Ecklin and Carter cite numerous instances of the district judge's interference and questioning. Yet, with the exception of one objection by Ecklin, neither Ecklin nor Carter objected to the district judge's participation at trial. See Fed. R. Evid. 614(c). Thus, we review the incident Ecklin challenged below for harmless error and the remaining instances of alleged interference for plain error. Godwin, 272 F.3d at 672-73.

A trial judge possesses broad authority to interrogate witnesses. Fed. R. Evid. 614(b); Godwin, 272 F.3d at 672. Trial judges have the right, and often the obligation, to "interrupt the presentations of counsel in order to clarify misunderstandings." United States v. Smith, 452 F.3d 323, 332 (4th Cir. 2006) (citation and quotation marks omitted); see also Fed. R. Evid. 611(a). Further, trial judges may "intercede [with questions] because of seeming inadequacy of examination or cross-examination by counsel, or to draw more information from reluctant witnesses . . . who are inarticulate or less than candid." United States v. Cassiagnol, 420 F.2d 868, 879 (4th Cir. 1970) (citation omitted).

Despite this broad discretion, a trial judge occupies a position of preeminence and special persuasiveness in the eyes of the jury and must thus ensure that "his participation during trial—whether it takes the form of interrogating witnesses, addressing counsel, or some other conduct—never reaches the point at which it appears clear to the jury that the court believes the accused is guilty." United States v. Parodi, 703 F.2d 768, 775 (4th Cir. 1983) (citations and quotation marks omitted). For example, "when a judge cross-examines a defendant and his witnesses extensively and vigorously, he may present to others an appearance of partisanship and, in the minds of jurors, so identify his high office with the prosecution as to impair the [jury's] impartiality[.]" Wallace v. United States, 281 F.2d 656, 666 (4th Cir. 1960) (citations and quotation marks omitted). "[A] judge's apparent disbelief of a witness is potentially fatal to the witness's credibility. And the credibility of a testifying defendant is often of crucial importance in a criminal trial." Godwin, 272 F.3d at 678.


1.

Ecklin noted one objection to the district judge's questioning during Ecklin's cross-examination:

> THE WITNESS: . . . At first I wasn't shooting at [Wallace][.] I was shooting in the air, and he started shooting at me.

9

. . .

THE COURT: So that's how all the shots got in the automobile which he had, correct?

. . .

THE WITNESS: I wouldn't say so. I would think that he shot his own car.

. . .

THE COURT: . . . You're saying [Wallace] shot up his own car while you were shooting at him, correct?

THE WITNESS: I wouldn't know how he shot his car, but, yes, he shot it.

THE COURT: . . . [Wallace] shot up his own car while you were shooting at him. Is that correct?

THE WITNESS: No.

. . .

THE COURT: He shot up his own car when?

THE WITNESS: I don't . . . I know he had to shoot his own car. Like I couldn't do that.

THE COURT: All I asked you is when.

THE WITNESS: I don't know.

J.A. 456–57. At that point, Ecklin's counsel objected, and the court overruled the objection.

The district judge's questions highlighted the apparent implausibility of Ecklin's response about how bullet holes got into Wallace's car. But even if the district judge's inquiry was sharper and more extensive than necessary, any error was

10

harmless. The district judge's initial questions for Ecklin were meant to clarify an apparently confusing factual situation about who first fired a weapon. And the court's questions were not so hostile as to indicate prejudgment of guilt. Cf. Cassiagnol, 420 F.2d at 877-79. Moreover, Ecklin admitted shooting into the air and towards Wallace. Whether Ecklin caused the bullet holes in Wallace's car does not bear on whether Ecklin acted in self-defense.

2.

Notwithstanding their failure to object at trial to any other alleged interference by the district judge, Ecklin and Carter argue that the district judge's extensive involvement indicated a disbelief of their defense. In support of their allegation, Defendants point to several exchanges between the district judge and certain witnesses. Defendants contend, among other things, that the district judge interfered with cross-examination of government witnesses and rehabilitated them, cross-examined defense witnesses at length-most importantly Ecklin and Carter-and impeached them, and generally showed favoritism to the government.

Our review of the trial transcript shows that both parties exhibited some difficulty with proper cross-examination and focusing on the relevant issues. The district judge was

11

therefore understandably frustrated, and he properly intervened to instruct both sides. See, e.g., J.A. 178-82, 233-35, 271; see also Smith, 452 F.3d at 333 ("[E]ven a stern and short-tempered judge's ordinary efforts at courtroom administration do not establish bias or partiality. . . . A tart remark or two might be what is needed to keep a lengthy trial on track.") (quotation marks omitted)). And at other points during the trial, the district judge properly questioned witnesses to clarify confusing factual issues or misunderstandings. See, e.g., J.A. 190, 227-29, 351, 365-71, 376-78, 459-61; see also Smith, 452 F.3d at 332-33.

Some of the district judge's questions, however, seem to undermine the substance and credibility of Ecklin's and Carter's testimonies. For example, during direct examination of Ecklin, the district judge questioned him extensively about what he did with the gun after the shooting. After Ecklin said that he threw the gun away, the judge asked, "So you just – you came back and threw this gun away? Do you know how much it's worth?" J.A. 455. When Ecklin responded that he would not care how much the gun was worth, the district judge asked how much Ecklin paid before for a different firearm and whether the gun he "shot up in the air was an automatic[.]" J.A. 455.

The district judge also asked some problematic questions during Carter's testimony. For example, when Carter testified

12

that he picked the gun up "[f]rom under the stairway, off the ground[,]" J.A. 463, the judge responded, "Off the ground? . . . It was just laying [sic] there? . . . You mean there was a – do you know what kind of gun it was?" J.A. 463. When Carter stated that he did not know the gun type, the district judge repeated, "You don't know what kind of gun it was?" and asked if the gun looked like the photographs shown during trial. J.A. 463. Later, the district judge again asked Carter if the gun was lying on the ground, how Carter knew it was under the stairway, and if a child could have picked it up.

Additionally, when Carter testified that he did not remember stating that he was a member of the Bloods gang, the judge acknowledged Carter's lack of memory, but then asked Carter, "Was the statement true or not true?" J.A. 467. Finally, Carter testified that he had been convicted of gang participation in a criminal act. The judge subsequently inquired if "the gang that you were convicted of, does it have guns?" J.A. 473.

These questions can be construed to reflect the court's skepticism or disbelief of Ecklin and Carter-sentiments that should not have been expressed to the jury. See Godwin, 272 F.3d at 678. But, to succeed on plain error review, "'the trial judge's comments [must be] so prejudicial as to deny a party an opportunity for a fair and impartial trial.'" Id. (citation

13

omitted). Thus, Ecklin and Carter must establish that the jury actually convicted them based upon the trial court's error. See id. at 680.

Given the evidence presented in this case, we are convinced that, had the district court's problematic questioning not occurred, any reasonable jury still would have rejected Ecklin's and Carter's justification defense. The government presented three eyewitnesses, all of whom were directly involved in the confrontation with Ecklin. Bonds and Wallace testified that Ecklin fired the gun before Wallace retrieved his gun from his car. Faulcon testified that she did not see Wallace approach Ecklin with a gun or point a gun at Ecklin. The government also called James, who testified that he told Ecklin about the "necessity law." J.A. 481.

Although the defense presented evidence to counter the government's case, Ecklin and Carter's justification defense was fated to fail given the inconsistencies in, and implausibility of, their evidence. At trial, the defense called several eyewitnesses, all of whom testified that they saw Wallace, but not Ecklin, with a gun. By contrast, both Ecklin and Carter testified that Ecklin had a gun. Moreover, Ecklin and Carter gave several patently incredible responses to the government's questions. For example, when asked what he did with the gun after the shooting, Ecklin testified that he "threw it[.]" J.A.

14

454. And when the government asked Carter where he found the firearm and when he first saw it, Carter testified that he found the weapon "[u]nder the stairway" and first saw it as he walked "through the hallway[.]" J.A. 468-69. Carter explained that he then saw the altercation involving Ecklin and ran back to get the firearm that he had just seen.

Moreover, the district court took steps to mitigate any possible prejudice that may have resulted from its problematic questioning. After the district judge interrogated a witness, he gave the parties a chance to address any newly raised issues. See, e.g., J.A. 229, 371, 378, 461, 473. And the judge instructed the jury that

> [d]uring the course of the trial I occasionally asked questions of witnesses in order to bring out facts on issues that may have to be determined by me or to bring forth information that I feel had not been fully covered in the testimony. Do not assume that I hold any opinion on the matters to which my questions may have related. Whatever you think my opinion is or may be is not to be considered by you. It's not my province to judge the guilt or innocence of the defendant, it's yours.

J.A. 554; see Smith, 452 F.3d at 333-34 (finding no plain error when the judge gave a similar jury instruction).

In sum, based on the record before us, we cannot conclude that the trial judge's comments were so prejudicial as to deny Ecklin or Carter an opportunity for a fair and impartial trial. See Godwin, 272 F.3d at 679. Nor can we conclude that the jury

15

actually convicted Ecklin or Carter based upon the trial court's error.  Id. at 680.[2]

B.

Ecklin and Carter next contend that the district court erred by imposing an obstruction of justice sentencing enhancement under United States Sentencing Guidelines § 3C1.1.

Appellate courts conduct a reasonableness inquiry coupled with an abuse-of-discretion standard of review to determine whether a district court properly imposed a sentence.  United States v. Perez, 661 F.3d 189, 192 (4th Cir. 2011) (citations

---

[2] As part of his judicial interference argument, Ecklin asserts that the district judge interfered during jury instructions by commenting to the jury about the unusual nature of the justification defense and by failing to give a requested reasonable doubt, presumption of innocence, and burden of proof instruction.  Ecklin, however, does not challenge these jury instructions as a separate issue on appeal.  Nor does he specifically argue that the district court erred in its jury instructions.  This issue is therefore not properly before us. Fed. R. App. P. 28(a).

Even if it were, we are not convinced that the district court erred, much less committed plain error, in its jury instructions.  First, the district court repeatedly instructed the jury that the government had the burden to prove guilt beyond a reasonable doubt.  The district court further instructed the jury that "[t]he defendants are presumed to be innocent of the crimes charged."  Transcript of Jury Charge at 135.  And the district court's comments about the unusual nature of the justification defense are consistent with the law.  See Noel v. Artson, 641 F.3d 580, 586 (4th Cir. 2011) (jury instructions must be correct); United States v. Mooney, 497 F.3d 397, 406 (4th Cir. 2007) (justification defense applies in the "rarest of occasions").

16

omitted). We first determine whether the district court committed a procedural error in sentencing. Gall v. United States, 552 U.S. 38, 51 (2007). If the district court's sentencing decision is procedurally sound, we then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard. Id.

To impose a two-level enhancement for obstruction of justice based on the defendant's perjurious testimony, "the sentencing court must find that the defendant (1) gave false testimony; (2) concerning a material matter; (3) with willful intent to deceive." Perez, 661 F.3d at 192 (citation and quotation marks omitted); see also U.S.S.G. § 3C1.1. The sentencing court must "specifically identify the perjurious statements and make a finding either as to each element of perjury or that encompasses all of the factual predicates for a finding of perjury." United States v. Akinkoye, 185 F.3d 192, 205 (4th Cir. 1999) (citation and quotation marks omitted); see also United States v. Dunnigan, 507 U.S. 87, 95 (1993).

Carter maintains that the district court failed to make sufficient findings to establish that he obstructed justice. At the sentencing hearing, the district court found that Carter falsely testified that he found the gun lying on the ground. Further, the district court explained to Carter that "[t]his offense didn't really involve you except that you got the

17

weapon. I don't know where the weapon was hidden, but it wasn't under the stairs. You know it; I know it. It didn't just appear and then disappear." J.A. 691. We conclude that these findings establish that Carter's false testimony was both material to his firearm possession charge and made with willful intent to deceive. See Perez, 661 F.3d at 193 (noting that with respect to willfulness, it would be enough for the court to say, "The defendant knew that his testimony was false when he gave it"); United States v. Quinn, 359 F.3d 666, 681 (4th Cir. 2004) (concluding that the defendant's false testimony was material because it concerned the essential facts of the crimes charged).

Ecklin similarly contends that the district court failed to make sufficient findings to establish that he obstructed justice. In sentencing Ecklin, however, the district court announced that even without the obstruction of justice enhancement, "the sentence this Court would impose would be exactly the same." J.A. 671. Further, the sentence the district court imposed was reasonable, even if the enhancement issue were decided in Ecklin's favor.

In United States v. Savillon-Matute, we affirmed a sentence based on an "assumed error harmlessness inquiry" consisting of (1) "knowledge that the district court would have reached the same result even if it had decided the guidelines issue the other way," and (2) "a determination that the sentence would be

18

reasonable even if the guidelines issue had been decided in the defendant's favor." 636 F.3d 119, 123 (4th Cir. 2011) (citation and quotation marks omitted).  Because the district court plainly stated that Ecklin's sentence would be the same and because we conclude that the sentence imposed was reasonable, even if the district court failed to make sufficient findings to support the enhancement, any error was harmless.  See id.

C.

With his final argument on appeal, Ecklin contends that he did not receive a fair trial because the government knowingly offered false testimony from James and because the district court admitted evidence of Ecklin's prior concealed weapon conviction and gang affiliation.  We review a district court's evidentiary rulings for abuse of discretion and will vacate a conviction only if the district court acted arbitrarily or irrationally in admitting evidence.  United States v. Basham, 561 F.3d 302, 325-26 (4th Cir. 2009).

Citing Giglio v. United States, 405 U.S. 150 (1972), Ecklin first contends that the government knew that James's trial testimony differed from his prior statement to the police, and yet allowed him to testify falsely.  Giglio held that "[a] new trial is required if the false testimony could in any reasonable

19

likelihood have affected the judgment of the jury." Id. at 154 (citation and quotation marks omitted).

Ecklin's argument is unavailing because James's allegedly false testimony could not have reasonably affected the jury's judgment. See id. During an interview with a police detective and a government attorney in December 2011, James reported that Ecklin told him about his criminal charges and that James then told Ecklin about the necessity defense. At trial, James reversed the order of those events, testifying that he told Ecklin about the necessity defense before Ecklin told him about Ecklin's charges. Because the chronological order of James's conversation with Ecklin is wholly irrelevant to Ecklin's justification defense and could not have reasonably affected the jury's judgment, we reject Ecklin's argument that he did not receive a fair trial on this basis.

Ecklin also contends that he did not receive a fair trial because the district court admitted evidence of his prior concealed weapon conviction. Under Rule 404(b), evidence of a crime is not admissible to prove a person's character, but may be admitted to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. Rule 404(b). The district court admitted evidence of Ecklin's prior concealed weapons conviction to show Ecklin's "plan to conceal weapons, his knowledge of the

20

apartment complex, . . . the locations for concealment, [and] his intent and his modus operandi in situations in which he conceals weapons up until and after he brandishes them." J.A. 327. The district court did not abuse its discretion by admitting Ecklin's prior conviction for these purposes.

Finally, Ecklin contends that he was denied a fair trial because the district court admitted "improper evidence of gang affiliation which was not substantiated." Ecklin Br. at 29. Other than one citation to the Joint Appendix, Ecklin does not develop this argument. Based on his single citation, Ecklin appears to argue that the government improperly asked him if he is in a gang and why his nickname is "Blood." J.A. 450. In response to the government's questions, Ecklin denied any gang membership. This innocuous inquiry clearly did not deny Ecklin a fair trial.

D.

Carter also raises several separate arguments on appeal. Carter first challenges the government's statement during closing argument that the jury should believe its witnesses because they had little or no criminal record.

21

Because Carter did not object to this statement at the time it was made,[3] we must review only for plain error. See United States v. Adam, 70 F.3d 776, 780 (4th Cir. 1995). To reverse for plain error, we must find that an error occurred, that the error was plain, that the error affected substantial rights, and that the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings. Id. With regard to his prosecutorial misconduct claim, Carter must show that the government's remarks were improper and so prejudiced his substantial rights that he was denied a fair trial. See United States v. Morsley, 64 F.3d 907, 913 (4th Cir. 1995). Several factors are relevant to the prejudice determination, including:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

Id. (citation and quotation marks omitted).

Carter's claim fails under both the plain error and prosecutorial misconduct standards. Even if the government improperly stated that "Ms. Bonds, Ms. Faulcon, [and] Mr.

---

[3] Carter's counsel did not object to the statement during the government's closing argument. Instead, counsel requested a sidebar following the government's closing argument to object.

Wallace . . . have minimal or no criminal history[,]" J.A. 527, this comment did not affect the fundamental fairness and integrity of the proceedings. The government's comment was isolated, unlikely to mislead the jury—particularly given Wallace's testimony that he was not a convicted felon—and did not divert the jury's attention to extraneous matters. Furthermore, even without the comment, there was substantial evidence from which the jury could determine witness credibility.

E.

With his last argument on appeal, Carter maintains that there was insufficient evidence to support his conviction. Carter essentially argues that because eyewitness testimony supported his justification defense, no reasonable jury could have rejected that defense. We review the denial of a Rule 29 motion de novo, construing the evidence and any inferences therefrom in the light most favorable to the government. United States v. Penniegraft, 641 F.3d 566, 571 (4th Cir. 2011). And we must sustain the jury's verdict if any reasonable trier of fact could have found Carter guilty beyond a reasonable doubt. See id.

Carter argues that "[o]nly Wallace was unequivocal" that Ecklin was armed first, Carter Br. at 17, whereas the remaining

23

eyewitnesses directly stated, or at least suggested, that Ecklin and Carter possessed a gun only in response to Wallace's gun possession and threat. Carter, however, mischaracterizes Faulcon's and Bonds's testimony. In fact, their testimony contradicted the defense's theory that Wallace threatened Ecklin with a gun before Ecklin acquired a gun. And, in reviewing the sufficiency of the evidence, we must assume that the jury resolved all contradictions in the government's favor. Id. at 572. Accordingly, there was sufficient evidence to support Carter's conviction.

## III.

In sum, we conclude that the district court did not err in its various rulings and therefore affirm.

AFFIRMED

24